**NATIONAL ADVERTISING COMPANY, Plaintiff–Appellant,**

v.

**CITY OF RALEIGH, North Carolina, Defendant–Appellee.**

**Southern Environmental Law Center, Amicus Curiae.**

**No. 90–3086.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1991.

Decided Oct. 25, 1991.

Michael M. Berger, argued, Fadem, Berger, Norton, Los Angeles, Cal., for plaintiff-appellant.

Thomas A. McCormick, argued, City of Raleigh, Raleigh, N.C., for defendant-appellee.

Katherine E. Slaughter, Southern Environmental Law Center, Charlottesville, Va., on the brief, for amicus curiae.

Before RUSSELL and WILKINS, Circuit Judges, and ELLIS, District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

ELLIS, District Judge:

Appellant National Advertising Company commenced this action in April 1989 under 42 U.S.C. § 1983 alleging that a 1983 ordinance adopted by the City of Raleigh, North Carolina, restricting off-premise outdoor advertising signs, violated the First and Fourteenth Amendments and also resulted in a taking without just compensation in violation of the Fifth and Fourteenth Amendments. The district court found that National's suit was barred by North Carolina's three-year limitations period set forth in G.S.N.C. § 1–52(2). On appeal, National contends that it suffered no injury from the ordinance, and hence no cause of action accrued, until a five-and-one-half (5½) year grace period provided in the ordinance for nonconforming signs expired. National also contends that its action is timely because the ordinance constitutes a "continuing" constitutional violation. The district court rejected National's contentions. Finding no error below, we affirm.

## I.

On October 18, 1983, the Raleigh city council adopted Ordinance No. 210 TC 198 ("the 1983 ordinance" or "the ordinance"), which by its terms became effective October 23, 1983.[1] This ordinance amended a 1979 ordinance that established zoning regulations for signs in Raleigh. The 1979 ordinance allowed "on-premise" signs, defined as signs located on the premises which "direct[ ] attention to a business, profession, commodity, service, or entertainment conducted, offered, sold, manu-

---

1. A detailed description of this ordinance appears in this Court's opinion in *Major Media of the Southeast, Inc. v. City of Raleigh,* 792 F.2d 1269, 1270–72 (4th Cir.1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987).

factured, or provided at a location on the premises where the sign is located or to which it is affixed," and permitted "off-premise" signs (or "non-point-of-sale" signs) and special category signs, including political signs, real estate signs and governmental and public purpose signs, in certain areas of Raleigh.

The 1983 ordinance modified the 1979 ordinance, *inter alia,* by reducing the size of permissible off-premise signs from 672 square feet to 150 square feet for signs facing streets with four or more traffic lanes, and to 75 square feet for signs facing streets with fewer than four traffic lanes. A further modification confined the location of such signs to so-called "industrial zones" as defined in the ordinance. Existing signs larger than the specified dimensions were declared nonconforming uses. Furthermore, the 1983 ordinance prohibited the construction of any new nonconforming signs and, except for ordinary maintenance and poster panel replacements, it also barred any structural alteration, reconstruction, or other material change to existing nonconforming signs unless the signs and their entire structures were brought into conformity with the 1983 ordinance. But existing nonconforming signs were not immediately banned. Rather, they enjoyed a 5½ year grace period beginning October 23, 1983. At the end of this period nonconforming signs were required to be removed, unless they fell within a state law exception for signs located adjacent to highways on the National System of Interstate and Defense Highways or on the Federal–Aid Primary Highway system. The 5½ year grace period (referred to in the ordinance as an "amortization" period) was in lieu of any other form of compensation.

National, a national advertising company, owns approximately thirty-six billboards in Raleigh. Sixteen of these billboards are located on federal highway systems and hence are exempted from the 1983 ordinance. National filed its complaint on April 28, 1989, more than three years after adoption of the 1983 ordinance and approximately one-month after expiration of the 5½ year amortization period.

Raleigh responded with a motion for summary judgment pursuant to Rule 56, Fed. R.Civ.P., contending that the action was barred either by G.S.N.C. § 1–54.1, which establishes a nine-month limitation period for "actions contesting the validity of any zoning ordinance or amendment thereto," or by G.S.N.C. § 1–52(2), which establishes a three-year limitations period for lawsuits based on "liability created by statute, either state or federal." The district court determined that the latter statute applied and barred National's suit. On appeal, National concedes that § 1–52(2) establishes the applicable limitations period. It contends, however, that it was not injured by the 1983 ordinance until the 5½ year amortization period for nonconforming signs expired and it was forced to remove its signs or contest the validity of the ordinance. Accordingly, National argues that the district court erred in finding that the cause of action accrued upon enactment of the ordinance in October 1983. Instead, National contends the cause of action did not accrue until either the expiration of the amortization period or, at the earliest, January 6, 1989, the date it received a notification letter from Raleigh demanding the removal of its nonconforming billboards by April 1989. Alternatively, National claims that the 1983 ordinance created a continuing constitutional violation and therefore National's action is timely. We review these claims *seriatim.*

## II.

■ Because there is no federal statute of limitations applicable to suits under § 1983, "it is the rule that the applicable 'provision limiting the time in which an action [under § 1983] must be brought, must be borrowed from the analogous state statute of limitations.'" *Bireline v. Seagondollar,* 567 F.2d 260, 262 (4th Cir. 1977), quoting *Cox v. Stanton,* 529 F.2d 47, 49 (4th Cir.1975). The parties take the view that the analogous state limitations period is the three-year limitations period established in G.S.N.C. § 1–52(2) for actions based on "liability created by statute, either state or federal." While we agree

that a three-year limitations period is applicable, we find that this limitations period is supplied by G.S.N.C. § 1–52(5), relating to personal injury actions, and not § 1–52(2).[2]

The selection of the appropriate statutory limitations period is only the first step in the analysis. There remains the question of when National's cause of action accrued. While the statutory limitations period for § 1983 actions is borrowed from state law, "[t]he time of accrual of a civil rights action is a question of federal law." *Id.* at 50; *Campbell v. Haverhill,* 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280 (1895); *Bridgford v. United States,* 550 F.2d 978, 981 (4th Cir.1977). "Federal law holds that the time of accrual is when plaintiff knows or has reason to know of the injury which is the basis of the action." *Cox,* 529 F.2d at 50; *see Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 1024–25, 93 L.Ed. 1282 (1949) ("statutes of limitations ... conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights"); *Blanck v. McKeen,* 707 F.2d 817, 819 (4th Cir.), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983); *Young v.*

*Clinchfield Railroad Co.,* 288 F.2d 499, 503 (4th Cir.1961).

The basis of a takings claim is the assertion that a regulation's "interference with appellants' property is of such magnitude that 'there must be an exercise of eminent domain and compensation to sustain [it].'" *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 136, 98 S.Ct. 2646, 2665, 57 L.Ed.2d 631 (1978), quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). In determining whether a taking has occurred, courts examine several factors, including "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. Courts conducting a takings analysis in the zoning context "have traditionally looked to the existing use of property as a basis for determining the extent of interference with the owner's 'primary expectation concerning the use of the parcel.'" *Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 170 (4th Cir.1991),[3] quoting *Penn Cen-*

---

**2.** In concluding that G.S.N.C. § 1–52(2) provides the applicable limitations period, the parties rely on past decisions of this Court. *See Bireline,* 567 F.2d at 263 (holding that § 1–52(2) is the most analogous limitations period for § 1983 actions); *Cox,* 529 F.2d at 49 (same). More recently, however, the Supreme Court held that the analogous state statute of limitations most appropriate for § 1983 actions is the limitation period for personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In 1989, the Supreme Court further refined *Wilson* by holding that

where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions.

*Owens v. Okure,* 488 U.S. 235, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989) (holding that New York's three-year residual statute of limitations for personal injury claims not embraced by specific statutes, rather than one-year statute of limitations for intentional torts, governed § 1983 action). Thus, as courts since *Wilson* have recognized, the three-year period for personal injury actions set forth in § 1–52(5) is the North Carolina limitations period applicable to § 1983 actions. *Mallas v. Kolak,* 721 F.Supp. 748 (M.D.N.C.1989); *Reagan v. Hampton,* 700

F.Supp. 850 (M.D.N.C.1988); *Reed v. United Transp. Union,* 633 F.Supp. 1516, 1525 (W.D.N.C.1986); *see also Keller v. Prince George's County,* 827 F.2d 952, 955 n. 2, 965 (4th Cir.1987) (recognizing that *Wilson v. Garcia* requires all § 1983 actions to be characterized as personal injury tort actions for statute of limitations purposes).

**3.** In *Esposito,* this Court concluded that a South Carolina statute effected no taking where it merely restricted the location for the rebuilding of beach cottages destroyed by natural causes or fire. 939 F.2d at 170. Although the result reached in Esposito differs somewhat from that reached here, particularly as we do not reach here the question of whether a taking actually occurred, the reasoning of the two decisions is consistent. The *Esposito* panel concluded that because appellants could continue to use their homes indefinitely and were "diminished only in their discretion to rebuild a structure in the speculative event of its virtually complete destruction," at 170, any current diminution in appellants' property values was not so great as to constitute a taking. There was no showing "that the regulation in question was 'so onerous that it [had] the same effect as an appropriation of the property through eminent domain or physical possession.'" *Esposito,* at 170, quoting *Williamson Planning Comm'n v. Hamilton Bank,*

*tral,* 438 U.S. at 136, 98 S.Ct. at 2665. Interference with the primary uses of a property is the touchstone of the analysis. In the zoning context, "diminution in property value, standing alone, [cannot] establish a 'taking'. . . . [T]he 'taking' issue in these contexts is resolved by focusing on the uses the regulations permit." *Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2662–63. The same principle applies in the present case. Hence, National's cause of action arose when the ordinance was enacted because it was then, if at all, that National suffered the regulatory interference with the primary uses of its property.

National contends that its cause of action did not accrue until the expiration of the 5½ year amortization period in April 1989, when it faced the City's demand that the nonconforming signs be removed. Until then, National asserts, it suffered no actual injury because the 1983 ordinance was neither applied nor enforced against it. Given this, National contends that no "as applied" challenge to the ordinance was possible before April 1989; at best only a facial

challenge to the ordinance's validity was possible prior to April 1989.[4]

■ National's contentions miss the mark. Immediately upon enactment, the 1983 ordinance interfered in a clear, concrete fashion with the property's primary use. Thus, on October 23, 1983, National's signs became "nonconforming outdoor advertising signs." As such, those signs became immediately subject to the restriction that "[a]ll nonconforming outdoor advertising signs shall be discontinued or made conforming (amortized) within five and one-half (5½) years from the date of this ordinance. . . ." The ordinance therefore interfered in a concrete fashion with National's primary use of its existing signs by mandating that this use change or cease within five years.

■ Moreover, National suffered actual, concrete injury on October 23, 1983. On that date, the useful lives of National's nonconforming signs were shortened from 30 years[5] to 5½ years. Thus, the present value of the nonconforming signs was re-

473 U.S. 172, 199, 105 S.Ct. 3108, 3123, 87 L.Ed.2d 126 (1985). The result in *Esposito* was based on the finding that none of appellants' homes had been destroyed and hence the rebuilding limitations had not yet been applied to any specific piece of property. As in *Esposito,* we look here to interference with the primary use of appellants' property as the principal consideration in the takings calculus. While *Esposito* reached the issue of whether a taking occurred, we do not. Instead, we decide here only when the injury occurred, not whether the injury was a taking. Specifically, we decide that the injury, which may or may not amount to a taking, occurred when the ordinance was enacted because its effect was then certain, not contingent, and because the injury complained of involved a significant interference with the primary use of specific property.

**4.** National cites no decisions directly on point to support these contentions. Instead, it relies on general propositions to the effect (1) that "petitioners ... face an uphill battle in making a facial [takings] attack," *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *see Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 856–57, 99 L.Ed.2d 1 (1988); *Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 294–95, 101 S.Ct. 2352, 2369–70, 69 L.Ed.2d 1 (1981); *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d

106 (1980) (rejecting claim that "mere enactment of [a] zoning ordinance constitute[d] a taking"), (2) that an "as applied" takings analysis requires a statute's having been applied "to specific property, and [inquiries conducted as to] the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances" of each case, *id.; accord Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. at 295, 101 S.Ct. at 2370; *see MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2565–66, 91 L.Ed.2d 285 (1986), and (3) that a takings claim is "premature" where administrative compensation and review mechanisms have not been exhausted. *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. at 348–52, 106 S.Ct. at 2565–67; *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 185–97, 105 S.Ct. 3108, 3115–22, 87 L.Ed.2d 126 (1985). National also relies on cases holding that no taking occurs where a regulation "does not interfere in any way with the present uses" of property. *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 136, 98 S.Ct. 2646, 2665, 57 L.Ed.2d 631 (1978); *see MacLeod v. County of Santa Clara,* 749 F.2d 541, 547 (9th Cir.1984), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2705, 86 L.Ed.2d 721 (1985).

**5.** National alleges in its complaint that its existing signs have remaining useful lives of up to 30 years.

duced accordingly. Had National sought to sell its nonconforming Raleigh signs between October 1983 and April 1989, a buyer would have discounted the value of these signs to account for their shortened life. Hence, on the date of the ordinance's enactment, there was both substantial interference with the property's primary use so as to affect distinct investment-backed expectations and also actual concrete injury accompanying that interference. Whether that interference was of such magnitude as to constitute an actual "taking" could have been determined upon the enactment of the statute in 1983. We do not reach the issue here of whether the interference "was of such a magnitude that 'there must be an exercise of eminent domain and compensation to sustain [it].'" *Penn Central*, 438 U.S. at 136, 98 S.Ct. at 2665, quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. at 413, 43 S.Ct. at 159. We hold only that the injury suffered by National, an injury that might or might not rise to the level of a taking, occurred upon enactment of the ordinance at issue.[6] National contends that its injury was not "concrete" in October 1983 because uncertainty allegedly then existed as to which of National's signs were subject to removal upon expiration of the amortization period. National alleges that as late as January 1989, City officials were unsure whether certain of National's signs located along the National System of Interstate Defense Highways and the Federal–Aid Primary Highway System were subject to removal. This claim is refuted on the face of the ordinance itself. It makes clear that signs along the federal highway systems were exempted from the 5½ year amortization scheme.[7] Hence, it was clear when the ordinance was approved in 1983 that of National's thirty-six Raleigh signs, the sixteen signs located on federal highway systems were exempt from the specific provision requiring removal within 5½ years.[8] Equally clear was

**6.** To determine whether the interference was so onerous as to constitute a taking requires a detailed analysis similar to that described in *Naegele Outdoor Advertising, Inc. v. City of Durham*, 844 F.2d 172, 176–78 (4th Cir.1988). Such analysis would include designating the appropriate unit of National's property affected by the ordinance, and a detailed factual inquiry as to (1) the economic impact of the regulation on National, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. *Id.* at 176. Secondary findings underlying these determinations would include "the number of billboards that are economically useless, the terms of [National's] leases for billboard locations, the land [National] owns for billboard locations and whether it has any other economic use, the cost of billboards that cannot be used, the depreciation taken on these billboards and their actual life expectancy, [and] the income expected during the grace period...." *Id*, at 178. Such an analysis would reveal, prior to the expiration of the amortization period, whether the amortization period permitted a reasonable recoupment of National's investment. *See, e.g., Art Neon Co. v. City and County of Denver*, 488 F.2d 118, 122 (10th Cir.1973) (upholding five-year amortization period for outdoor signs as reasonable prior to period's expiration), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *see also Summey Outdoor Advertising, Inc. v. The County of Henderson*, 96 N.C.App. 533, 386 S.E.2d 439, 446 (1989) (same), *pet. for disc. rev. denied*, 326 N.C. 486, 392 S.E.2d 101 (1990); *R.O. Givens, Inc. v. Town of Nags Head*, 58 N.C.App. 697, 294

S.E.2d 388, 391 (same with respect to five-and-one-half year period), *pet. for disc. rev. denied*, 307 N.C. 127, 297 S.E.2d 400 (1982); *compare La Mesa v. Tweed and Gambrell Mill*, 146 Cal. App.2d 762, 304 P.2d 803 (1958) (holding invalid as a taking a five-year amortization period applied to building with estimated remaining economic life of 20 years).

**7.** The ordinance stated in relevant part:

WHEREAS, North Carolina General Statutes 136–131.1 prohibits the regulatory amortization of outdoor advertising signs adjacent to highways on the National System of Interstate Defense Highways and the Federal-aid Primary Highway System and that the gradual attrition of these outdoor advertising signs provides suppliers and consumers of outdoor advertising an abundant reservoir of locations within the Raleigh market....

BE IT ORDAINED BY THE CITY COUNCIL OF RALEIGH, NORTH CAROLINA that:

....

All nonconforming outdoor advertising signs shall be discontinued or made conforming (amortized) within five and one-half (5½) years from the effective date of this ordinance ( [October 23, 1983] ), *unless explicitly prohibited by State Statute.*

(Emphasis added).

**8.** The sixteen signs located along federal highway systems, while exempt from the removal requirement, still remained "nonconforming uses" subject to the ordinance's other restrictions, such as the prohibitions on reconstructing

that the twenty remaining signs were not so exempted. Because the ordinance applied in clear, specific ways to National's thirty-six signs when enacted, and because any injury to National was real and could be calculated in terms of reduced present value on October 23, 1983, National's cause of action arose on that date.

National's cited authority is not to the contrary. This authority emphasizes that takings challenges normally focus on a statute's application to specific property, rather than attacking a statute or ordinance on its face. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 294–96, 101 S.Ct. 2352, 2369–70, 69 L.Ed.2d 1 (1981). In this regard, the Supreme Court has explained that the very nature of takings inquiries usually necessitates an "as applied" rather than a "facial" [9] takings challenge:

> These "ad hoc, factual inquiries" must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances.

*Hodel,* 452 U.S. at 295, 101 S.Ct. at 2370. Yet no such inquiry, National argues, could have been conducted until 1989 because the 1983 ordinance was not applied to any specific property until National was required to remove its signs in April 1989. Hence, it contends that an "as applied" challenge favored by *Hodel, Keystone* and similar cases could not have been mounted until 1989 and, at best, only a fruitless facial challenge could have been made in 1983. But the present matter is easily distinguished from cases involving premature facial challenges.[10] Here, the 1983 ordinance applied when enacted to specific property— National's thirty-six off-premise signs in the Raleigh area. The ordinance's language made clear that its 5½ year amortization scheme applied to twenty of the thirty-six National signs, *i.e.,* those signs not located along federal highway systems. Thus, the "ad hoc, factual inquiries" that "must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation" relevant to a takings analysis, *Hodel,* 452 U.S. at 295, 101 S.Ct. at 2370, could have been conducted in 1983. There is, therefore, no error or injustice in holding that

damaged nonconforming signs, moving existing nonconforming signs to new locations on their lots, or building more such signs along the federal highway systems. *Compare National Advertising Co. v. Bradshaw,* 48 N.C.App. 10, 268 S.E.2d 816, *appeal dismissed,* 301 N.C. 400, 273 S.E.2d 446 (1980) (holding illegal National's reconstruction of sign deemed nonconforming under state statute and located along federal highway system where sign was more than 50 percent destroyed by wind).

**9.** A facial takings attack is a claim that the "mere enactment" of a statute constitutes a taking. *Hodel,* 452 U.S. at 295, 101 S.Ct. at 2370. An "as applied" challenge focuses on the effect of a statute's application to specific property.

**10.** Both *Hodel* and *Keystone,* for example, involved facial attacks on expansive regulatory programs affecting mining properties *in general,* but not specifically identified properties. Moreover, because owners might win variances or exemptions from the program, a challenge of the program's application to specific property was not yet ripe. In *Hodel,* the Virginia Surface Mining and Reclamation Association brought a facial takings challenge against interim regulations promulgated by the Department of the Interior pursuant to the Surface Mining Control and Reclamation Act of 1977, 91 Stat. 447, 30 U.S.C. § 1201 *et seq.* (1976 ed., Supp. III). The regulations, *inter alia,* required "steep slope" surface mine operators to return a mining site to its "approximate original contour." A mine operator could obtain a variance from this requirement, however, by showing that a site's new condition would allow a postreclamation economic or public use equal or better than what would otherwise be possible. *Hodel,* 452 U.S. at 284, 101 S.Ct. at 2364. The Supreme Court held that the regulations and underlying statute did not "on [their] face, prevent beneficial use of coal-bearing lands." *Id.* at 296, 101 S.Ct. at 2370. It noted that once the regulations were applied, operators might obtain variances, provided for in the regulations, from the contour requirement. It further observed that "the 'taking' issue suffers from a fatal deficiency: neither appellees nor the [lower] court identified any property in which appellees have an interest that has allegedly been taken by operation of the Act." *Id.* at 294, 101 S.Ct. at 2369–70. The Supreme Court reached a similar result when reviewing another facial challenge to a statute regulating coal mining in *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. at 493–99, 107 S.Ct. at 1246–49.

National could have mounted an "as applied" challenge in October 1983 and therefore its cause of action arose at that time.[11]

■ Decisions holding takings challenges to be "premature" because of the availability of administrative compensation and review mechanisms [12] are also inapposite. The 1983 ordinance did not establish any variance or administrative review procedures through which sign owners might obtain relief. Instead, it provided for immediate compliance without exception.[13] Moreover, the ordinance provided for no compensation other than what it referred to as "amortization." It stated that "amortization of nonconforming outdoor signs, in contrast to grandfathering these nonconformities, will eliminate the excessive number and amount of outdoor advertising signs and signage." Hence, just as there are no variance or compensation procedures which National must exhaust now before bringing its suit, none existed in 1983 to prevent ripeness of its suit.

Finally, National is mistaken in relying on cases holding that no taking occurs where regulations permit the current use of property to continue unhindered. *See Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 136, 98 S.Ct. 2646, 2665, 57 L.Ed.2d 631 (1978); *MacLeod v. Santa Clara County,* 749 F.2d 541 (9th Cir.1984). The regulations challenged in *Penn Central* and *MacLeod* had no impact on the current uses (a railroad station and a cattle ranch, respectively) of the properties at issue. Unlike those regulations, the 1983 ordinance had a specific and immediate impact on the current use of certain signs. It mandated that the current and perhaps sole use of twenty of National's nonconforming signs cease within 5½ years, thus having a specific and immediate impact on the primary use of National's property.

In sum, when enacted the 1983 ordinance interfered in concrete ways with National's primary use of specific property—thirty-six signs. The district court therefore did not err in determining that National's takings cause of action arose in October 1983.

### III.

■ National's second appeal ground is that its suit is timely because the 1983 ordinance created a continuing constitutional violation. This ground, too, fails because this is not a continuing violation case. As has been observed many times: "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir. 1981); *accord Ocean Acres Ltd. v. Dare County Bd. of Health,* 707 F.2d 103, 106 (4th Cir.1983). Here, any taking occurred at the time of the ordinance's enactment; what continued was the ill effect of the ordinance's enactment and the alleged taking. No continuing unlawful acts have been shown.

■ In general, "[t]o establish a continuing violation ... the plaintiff must establish that the unconstitutional or illegal act was a ... fixed and continuing practice." *Perez v. Laredo Junior College,* 706

---

11. Consistent with this conclusion are those decisions involving advertisers that attacked sign ordinances on takings grounds prior to the expiration of amortization periods. In none of those decisions was the attack challenged as premature. *See, e.g., Major Media of the Southeast, Inc. v. City of Raleigh,* 621 F.Supp. 1446, *aff'd,* 792 F.2d 1269 (4th Cir.1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987); *Summey Outdoor Advertising, Inc. v. The County of Henderson,* 96 N.C.App. 533, 386 S.E.2d 439 (1989), *pet. for disc. rev. denied* 326 N.C. 486, 392 S.E.2d 101 (1990); *R.O. Givens, Inc. v. Town of Nags Head,* 58 N.C.App. 697, 294 S.E.2d 388, *pet. for disc. rev. denied,* 307 N.C. 127, 297 S.E.2d 400 (1982).

12. *See, e.g., MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. at 351–52, 106 S.Ct. at 2567–68; *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. at 186–191, 105 S.Ct. at 3116–19; *Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. at 297, 101 S.Ct. at 2371.

13. The ordinance stated: "*All* outdoor advertising signs shall be consistent with *all* definitions and shall comply with *all* standards and regulations of this code," and "*All* nonconforming outdoor advertising signs shall be discontinued or made conforming (amortized) within five and one-half (5½) years ... unless explicitly prohibited by State Statute." (Emphasis added.)

F.2d 731, 733 (5th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984). The challenged action must be repeated within the statute of limitations period. As the *Perez* court observed in the context of employment discrimination:

> If the discrimination alleged is a single act, the statute begins to run at the time of the act. If, on the other hand, the statutory violation does not occur at a single moment but in a series of separate acts and if the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation and only those violations preceding the filing of the complaint by the full limitations period are foreclosed.

*Id.* at 733–34 (footnotes omitted).

■ With respect to statutory or regulatory challenges, we have previously found a continuing violation where regulations continued to be applied to persons within the statutory limitations period. *Virginia Hospital Ass'n v. Baliles,* 868 F.2d 653, 663 (4th Cir.1989), *affirmed,* —— U.S. ——, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1989). Yet we have found no continuing violation where any harm to the plaintiff stemmed only from the initial application of a regulatory prohibition. *Ocean Acres Ltd. v. Dare County Bd. of Health,* 707 F.2d at 106. This distinction is well illustrated in the facts of the two cases. In *Virginia Hospital Ass'n v. Baliles,* we affirmed a district court opinion holding that "[t]he *continued enforcement* of an unconstitutional statute cannot be insulated by the statute of limitations." 868 F.2d at 663 (emphasis added). There, we held that plaintiff's claim that Virginia's procedures for reimbursing hospitals for the cost of treating Medicaid patients violated the Medicaid Act, 42 U.S.C.A. § 1396 *et seq.,* although brought four years after adoption of the procedures, was not barred by Virginia's applicable two-year statute of limitations. This conclusion rested on the holding that "the limitations period cannot protect an allegedly unconstitutional program." *Id.* On the other hand, in *Ocean Acres,* we determined that the "continuing wrong" exception did not apply to munici-

pal ordinances banning the installation of septic tanks on certain properties. 707 F.2d at 105–07. In reaching this conclusion, we applied the two-part analysis outlined in *Cooper v. United States,* 442 F.2d 908 (7th Cir.1971) for determining whether a continuing wrong exists: "The particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged, must all be considered." *Id.* at 912. Ultimately, we concluded there that plaintiff's allegations of harm focused "on the initial actions taken by defendants, not on a continuing course of conduct." *Ocean Acres,* 707 F.2d at 106. Moreover, statute of limitations policies were satisfied in *Ocean Acres* because at the time of the ban's enactment "[p]laintiff was aware of the actions taken by the county and of the impact of those actions on its proposed [real estate] development." *Id.* at 107. Application of this two-part analysis leads to the same conclusions here.

■ National's claimed harm is that the 1983 ordinance restricted the use of its property without providing just compensation. The challenged municipal action, however, does not amount to a continuing wrong. The restriction on use and the economic loss of which National complains occurred upon enactment of the ordinance. No City action since then has added to National's alleged injury or otherwise constituted a taking. Seeking to avoid this conclusion, National points to a January 1989 letter from Raleigh, informing it that its nonconforming signs would have to be removed by April 1989, as a later wrongful act committed by the City within three years of National's suit. This argument misses the mark. The letter was not a new wrongful act, but merely a reminder of the restriction placed on National's signs in 1983. It caused National no additional injury, and is not itself the source of the alleged taking. The fact that National's signs ultimately were required to be removed or brought into conformity by April 1989 was one of the *effects* of their being deemed nonconforming upon enactment of the ordinance, not a separate violation.

*Compare Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (plaintiff's loss of teaching position was merely "one of the *effects*" of alleged discriminatory denial of tenure; no "continuing violation" shown); *Abramson v. University of Hawaii,* 594 F.2d 202, 209 (9th Cir.1979) ("[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful"). This is not an instance of a statute's repeated enforcement against different individuals or even the same parties, but of a statute applied once to a discrete set of individuals with a foreseeable, ascertainable impact. In sum, an examination of the "nature of the wrongful conduct and harm alleged," *Ocean Acres,* 707 F.2d at 106, points persuasively to the absence of a continuing wrong.

■ Finally, an examination of the "particular policies of the statute of limitations in question," *Id.* at 107, supports the conclusion that no unfairness results from finding that the continuing wrong exception is inapplicable here. National was aware of the 1983 ordinance from at least the date of its enactment. National participated in rulemaking proceedings prior to adoption of the ordinance and clearly knew of its terms in 1983; moreover, National was required by law to be cognizant of the numerous restrictions placed on its signs upon the ordinance's enactment. Upon the adoption of the ordinance, National was in a position to challenge it. "[A] 'continuing wrong' theory should not provide a means of relieving plaintiff from its duty of reasonable diligence in pursuing its claims." *Ocean Acres,* 707 F.2d at 107. Permitting National to challenge the 1983 ordinance's amortization scheme more than 5½ years after its adoption would enable National to retain its signs well beyond expiration of the amortization period and would be unfair to the City. Hence, statute of limitations policies militate against finding a continuing violation.

14. The ordinance states that its purpose is to "enhance property values traffic safety, and

## IV.

National contended before the district court that the 1983 ordinance on its face violates the First Amendment because it (i) restricts speech without promoting a legitimate government interest, (ii) is overbroad, and (iii) is unconstitutionally vague. The district court specifically addressed only the first of these claims, and found that it was barred by the three-year statute of limitations because "plaintiff had reason to know of this alleged injury at the time the ordinance became effective." Because it is doubtful that an ordinance facially offensive to the First Amendment can be insulated from challenge by a statutory limitations period, and since National's First Amendment claims raise purely legal issues which are well-settled, we review National's First Amendment claims on the merits.

■ National contends that the 1983 ordinance does not substantially advance a legitimate state interest and is overbroad because the effect of its size limitations will be to eliminate all outdoor off-premise advertising. Settled authority compels rejection of these claims. In *Major Media of the Southeast v. City of Raleigh,* 792 F.2d 1269 (4th Cir.1986), we recognized that the Supreme Court "determined in *Metromedia [Inc. v. City of San Diego,* 453 U.S. 490, 508–11, 101 S.Ct. 2882, 2893–94, 69 L.Ed.2d 800 (1981) ] ... that a city may justifiably prohibit all off-premise signs or billboards for aesthetic and safety reasons." 792 F.2d at 1272; *see also Suffolk Outdoor Advertising Co. v. Hulse,* 439 U.S. 808, 99 S.Ct. 66, 58 L.Ed.2d 101 (1979) (summarily upholding ordinance banning all off-premise billboard advertising); *Metromedia,* 453 U.S. at 508–11, 101 S.Ct. at 2893–94; at 540–41, 101 S.Ct. at 2909–10 (Stevens, J., dissenting in part); at 570, 101 S.Ct. at 2924 (Rehnquist, J., dissenting) ("the aesthetic justification alone is sufficient to sustain a total prohibition on billboards within a community"). Because the 1983 ordinance was enacted to promote aesthetic and safety concerns,[14] National's

[the] community appearance" of Raleigh.

first two First Amendment claims fail under *Metromedia*.

 National's remaining First Amendment claim is that the ordinance is unconstitutionally vague because in certain limited instances it requires city officials to determine whether the contents of an advertisement are "commercial" or "non-commercial."[15] National contends that since the ordinance contains no definition of "commercial" or "non-commercial," insufficient guidance is given city officials. We rejected this precise contention in *Major Media of the Southeast v. City of Raleigh*, 792 F.2d at 1272, finding that the Supreme Court has already sufficiently defined these terms. *See Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2348–49, 65 L.Ed.2d 341 (1980) (commercial speech is "expression related solely to the economic interests of the speaker and its audience"); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 (1976) (commercial speech "does 'no more than propose a commercial transaction'"), quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558–59, 37 L.Ed.2d 669 (1973); *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 3031, 106 L.Ed.2d 388 (commercial speech "propose[s] a commercial transaction"). We further observed in *Major Media* that:

Although an occasional marginal case might arise raising the question of whether on the particular facts the definition of commercial speech would be

correct, such an infrequent possibility should not itself justify a generalized charge that the ordinance itself is vague, given the guidance afforded by the court decisions in the area.

*Id.* at 1272–73. We find no reason to depart from our previous holding.[16] In sum, we reject National's First Amendment claims on the merits.

Accordingly, we affirm the decision of the district court granting summary judgment to Raleigh.

AFFIRMED.

**15.** Raleigh's ordinance, as amended on December 4, 1984 by Ordinance 450 TC 228, states: "Any sign authorized in this chapter is allowed to contain non-commercial copy in lieu of any other copy." As we noted *Major Media of the Southeast v. City of Raleigh*, 792 F.2d at 1271 n. 2, this amendment "seems to allow non-commercial copy to be placed on any on-premise sign (or any permitted off-premise sign) instead of commercial copy." In many instances, then, city officials are not required to determine whether an advertisement is commercial or non-commercial. However, in certain limited instances, if a sign is proposed for an area where neither on-premise nor off-premise signs

are permitted, an inspector may nevertheless permit the sign if its contents are non-commercial. *Id.* at 1271. In these limited instances, an analysis of the contents of the sign is required.

**16.** We also note that even if the specific provisions of the Raleigh ordinance that require inspectors to consider the content of an advertisement were held invalid, the size limitations on off-premise advertising, which are the provisions that affect National, would remain in force. *See* Raleigh City Code § 14–1004 (discussing severability of "sections, paragraphs, sentences, clauses and phrases of this Code").