**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THE NEW PULASKI COMPANY LIMITED
PARTNERSHIP, a Maryland Limited
Partnership,
Plaintiff-Appellant,

v.                                                                No. 97-2118

MAYOR AND CITY COUNCIL  OF
BALTIMORE, a Municipal
Corporation,
Defendant-Appellee.

THE NEW PULASKI COMPANY LIMITED
PARTNERSHIP, a Maryland Limited
Partnership,
Plaintiff-Appellee,

v.                                                                No. 97-2204

MAYOR AND CITY COUNCIL  OF
BALTIMORE, a Municipal
Corporation,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-97-38-S)

Argued: January 29, 1999

Decided: July 20, 2000

Before WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Michael wrote the majority opinion, in which Judge Motz concurred. Judge Williams wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Roger Warren Titus, Kevin Barry Collins, VENABLE, BAETJER & HOWARD, L.L.P., Rockville, Maryland, for Appellant. Burton Harry Levin, Principal Counsel, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellee. **ON BRIEF:** Thomas P. Perkins, III, Mitchell Y. Mirviss, VENABLE, BAETJER & HOWARD, L.L.P., Rockville, Maryland, for Appellant. Otho M. Thompson, City Solicitor, Kathryn E. Kovacs, Assistant Solicitor, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

MICHAEL, Circuit Judge:

The New Pulaski Limited Partnership Company (Pulaski) sued the Mayor and City Council of Baltimore (together, the"City") in Maryland state court, asserting that the City had violated its rights under the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment by imposing and maintaining a moratorium ordinance that prevented Pulaski from building a replacement incinerator on its Baltimore property. Although the case was brought mainly under 42 U.S.C. § 1983, Pulaski also relied on provisions in the Maryland Constitution. The City removed the action to federal court, where the judge dismissed Pulaski's complaint on statute-of-limitations grounds. We affirm.

2

I.

We accept the well-pleaded facts in the complaint and recite them in the light most favorable to Pulaski. See Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996). The case arises out of the operation of a solid waste incinerator located on Pulaski Highway in Baltimore. The City owned and operated the incinerator for twenty-five years, from 1956 until 1981. On May 6, 1981, the City sold the incinerator to Pulaski for $41 million and leased the associated land to Pulaski for fifty years. As part of the transaction, Pulaski and the City entered into a Waste Disposal Service Agreement (WDSA). The WDSA required Pulaski to provide priority waste disposal service to the City and other local jurisdictions. In return, the City was required to reimburse Pulaski for certain expenses in operating the incinerator, including the costs of complying with environmental laws, orders, and regulations. The WDSA's original term was fifteen years, and the City had options to renew the agreement for up to fifteen additional years.

For the first eleven years the WDSA was in effect, the City paid its prescribed share of environmental compliance costs. Trouble began, however, when the Maryland Department of the Environment (MDE) took steps to force Pulaski to comply with the federal Clean Air Act Amendments of 1990 and the EPA's implementing regulations. Specifically, the MDE ordered Pulaski either to make substantial renovations to the incinerator or to replace it with a new facility. When the City learned that the cost to upgrade the incinerator could exceed $40 million, it balked. In a letter dated May 8, 1992, the City advised Pulaski that it would "not reimburse any expenses incurred in retro-fitting" the incinerator. With the City refusing to pay its share, Pulaski could not afford to retrofit the existing incinerator. Pulaski therefore proposed an alternative: it would build a new, state-of-the-art (replacement) incinerator on the site that would comply with the new environmental laws and regulations. Pulaski offered to build the replacement facility at no cost to the City, to pay the City a $10 million start-up fee, and to release the City from its obligation to pay a portion of the cost to retrofit the existing incinerator.

Meanwhile, community opposition was mounting against the operation of any incinerator -- whether retrofitted or new -- at the

3

Pulaski site. The public pressure prompted the Baltimore City Council to enact an ordinance on August 7, 1992, prohibiting construction, reconstruction, replacement, or expansion of any incinerator in the City (the "Moratorium"). The Moratorium provided that the City Council could, by further ordinance, authorize an incinerator project, if it was certified by the Director of Public Works. The Moratorium stated, in pertinent part:

> AN ORDINANCE concerning
>
> A MORATORIUM ON THE CONSTRUCTION
> OF INCINERATORS
>
> FOR the purpose of imposing a 5-year moratorium on the construction, reconstruction (other than pollution control measures), replacement and expansion of incinerators within Baltimore City; providing for certification by the Director of Public Works regarding the necessity for certain construction, reconstruction, replacement or expansion, and City Council approval thereof and defining certain terms; providing for an extension of the moratorium under certain circumstances, and providing penalties.
>
> * * *
>
> SEC. 3. AND BE IT FURTHER ORDAINED, That for a period of 5 years subsequent to the date of enactment of this Ordinance:
>
>  a. No person shall construct, reconstruct, replace or expand any incinerator in Baltimore City. Provided, however, that if the Director of Public Works certifies in a written report by detail and analysis to the City Council that such construction, reconstruction, replacement or expansion is necessary to serve the public interest in the efficient, economic, safe and environmentally sound disposal of solid waste, the City Council by ordinance may approve such construction, reconstruction, replacement or expansion.

4

Baltimore, Md., Ordinance No. 128, 1992 Legislative Session (effective Sept. 6, 1992).

After enacting the Moratorium, the City continued to make things difficult for Pulaski. The City cut off shipments of its trash to Pulaski, interfered with Pulaski's supply of trash from Baltimore County, and denied Pulaski the use of a municipal landfill to dispose of waste ash. The City also delayed making payments due to Pulaski under the WDSA. On December 22, 1993, Pulaski sued the City in the Circuit Court for Baltimore County, seeking (1) a declaratory judgment that the Moratorium was preempted by state law and (2) damages for the City's alleged breach of the WDSA. A Pulaski representative met with the Mayor on January 24, 1994, to discuss settlement of the lawsuit. The Mayor promised Pulaski that he would support an ordinance exempting Pulaski from the Moratorium if Pulaski would withdraw its lawsuit and negotiate an agreement terminating the WDSA. Encouraged by the Mayor's assurances, Pulaski dismissed its lawsuit without prejudice on January 31, 1994, and entered into negotiations with the City to terminate the WDSA.

On March 11, 1994, Pulaski's consultant submitted a report to the Director of Public Works that supported the need for a replacement incinerator. Thereafter, on May 5, 1994, the Director certified to the City Council that a replacement incinerator at the Pulaski site was "necessary to serve the public interest." Four days later, a bill was introduced in the City Council to grant Pulaski an exemption from the Moratorium (the "Exemption Bill"). The Exemption Bill was never submitted to a vote. Indeed, it was not even reported out of committee.

Although the Exemption Bill had languished for an entire year, on May 3, 1995, Pulaski entered into a Settlement Implementation Agreement (the "SIA") with the City terminating the WDSA. Among other things, the SIA ended the City's obligation to pay Pulaski operating costs, including retrofitting costs, for the old incinerator. Also, Pulaski waived all outstanding contractual claims under the WDSA.

On June 23, 1995, less than two months after signing the SIA, Pulaski filed a second declaratory judgment action in the Circuit Court for Baltimore County seeking to invalidate the Moratorium. On

5

January 5, 1996, that court entered judgment in favor of Pulaski, striking down the Moratorium on the ground that it was preempted by state environmental laws. The Court of Special Appeals of Maryland affirmed, Baltimore v. New Pulaski Co. Limited Partnership, 684 A.2d 888 (Md. Ct. Spec. App. 1996), and the State's Court of Appeals denied the City's petition for a writ of certiorari, Baltimore v. New Pulaski Co. Limited Partnership, 690 A.2d 523 (Md. 1997).

Pulaski shut down the old incinerator in August of 1995, and it never built a new one. Pulaski contends that the City's obstructive tactics caused delays that prevented Pulaski from building a profitable replacement incinerator. Pulaski filed the case that is now before us in the Circuit Court for Baltimore County on December 31, 1996. Pulaski alleges that the City's imposition of the Moratorium, as well as its failure to pass an ordinance exempting Pulaski from it, (1) amounted to a taking of its property without just compensation in violation of the United States and Maryland Constitutions and (2) violated Pulaski's right to substantive due process under the United States and Maryland Constitutions. The City removed the case to federal court and filed a motion to dismiss on the ground that Pulaski's claims were time barred. The district court granted the motion, concluding that Pulaski's claims accrued "upon enactment of the moratorium" in 1992 and were thus barred by Maryland's three-year statute of limitations. (Maryland's three-year statute, embodied in Md. Code Ann. Cts. & Jud. Proc. § 5-101, applies to this § 1983 action.) The district court also held that the "continuing wrongs" theory did not operate to toll the statute. Finally, the court held that the City was not equitably estopped from raising the statute of limitations as a defense. Pulaski appeals.

II.

Pulaski argues that the three-year statute of limitations did not begin to run on its "as applied" takings claims until the City Council failed to enact the Exemption Bill. According to Pulaski, the passage of the Moratorium ordinance, which blocked construction of the replacement incinerator, did not trigger the statute. We cannot agree.

When an ordinance is alleged to have effected a taking, the claim accrues when the "ordinance interferes in a clear, concrete fashion

6

with the property's primary use." <u>National Advertising Co. v. City of Raleigh</u>, 947 F.2d 1158, 1163 (4th Cir. 1991) (holding that takings claim directed at ordinance restricting off-premises advertising signs accrued on the date of enactment, even though there was a 5-year grace period for nonconforming signs). However, a takings claim is not ripe, and the statute of limitations does not begin to run, unless the property owner has exhausted any available administrative exemption and compensation procedures. <u>Id.</u> at 1166. As we noted in <u>National Advertising</u>, the need to determine whether a claim is ripe is required by <u>Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City</u>, 473 U.S. 172 (1985). <u>See National Advertising</u>, 947 F.2d at 1166 n.12. In <u>Williamson</u> the Supreme Court held that a takings claim remains premature until the governmental entity "has reached a <u>final decision</u> regarding the application of the regulations to the property at issue." <u>Williamson</u>, 473 U.S. at 186 (emphasis added). And, in <u>National Advertising</u> we held that <u>Williamson</u>'s requirement for a final decision was satisfied upon enactment of an ordinance restricting land use when the ordinance did not contain administrative variance or exemption procedures"through which [property] owners might obtain relief." <u>National Advertising</u>, 947 F.2d at 1166.

The question for us is whether the Moratorium contained any true administrative exemption procedures that would have prevented Pulaski's claim from being mature on the effective date of the Moratorium. In answering this question, we must decide whether the process by which City Council considered an exemption ordinance was administrative or legislative. Understanding the process is essential because an administrative "decision denying a variance is final, whereas a [legislative] decision not to [pass] a law never is." <u>Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency</u>, 911 F.2d 1331, 1345 (9th Cir. 1990) (Kozinski, J., dissenting), <u>relied upon in Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency</u>, 938 F.2d 153, 157 (9th Cir. 1991). Under an administrative exemption process, the decisionmaking body grants or denies an exemption based on established standards that guide the decision. The administrative process is, by its nature, finite. <u>See Tahoe-Sierra Preservation Council</u>, 911 F.2d at 1345. At the end of the process the governmental body makes a decision and communicates it to the applicant. The consideration of a proposed ordinance,

7

on the other hand, "requires an exercise of political judgment." Id. And, as Judge Kozinski said,

> Political processes are, by their nature, infinite. A change in the makeup of the legislative body, a shift in the political winds, or even a change in attitude based on further experience or additional wisdom, may be a sufficient reason for a political body to change its mind. . . . There is thus no way for a court to say that a legislative process has come to rest with respect to a [proposed] law.
>
>  . . . To require plaintiffs to demonstrate that a governing body has made a final decision about what amendments it will allow is to preclude judicial review altogether, as each day brings a new opportunity for the legislature, in its wisdom, to change the law.

Id. (footnotes omitted).

Here, the Moratorium, which outlawed replacement incinerators (including Pulaski's), permitted the Director of Public Works to certify to the City Council that a replacement incinerator was "necessary to serve the public interest in the efficient, economic, safe and environmentally sound disposal of solid waste." Once the Director made a certification, the City Council could, if it chose, pass an ordinance approving construction of an incinerator. In this case Pulaski submitted materials to the Director to support the need for a replacement incinerator, and the Director made a certification of need to the City Council. The Exemption Bill was then introduced. Nothing happened thereafter. The bill was never reported out of committee, and it was never brought up for a vote in City Council. No final decision on the possible exemption was ever communicated to Pulaski.

The process for the City Council's consideration of the Exemption Bill was not administrative. Although there were standards for the Director's certification of need, the City Council itself was not subject to any guidelines in deciding whether or when to consider an exemption ordinance. The City Council let the Exemption Bill languish, taking no action at all. That failure to act was the exercise of political

8

judgment. The process was thus legislative, and there was, by definition, no "final decision" on the exemption proposal.

Pulaski argues that its "as applied" takings claim "did not ripen, and therefore for limitations purposes, did not arise or accrue until, at the earliest, September 1995, when the City filed a pleading admitting that the Exemption Bill was `dead.'" Brief for Appellant at 24. As our discussion above indicates, this contention has no merit. First, filing a pleading admitting that proposed exemption legislation is "dead" is not the same as making a final administrative decision to deny an exemption. Second, Pulaski's argument proves how difficult it would be for courts to determine the exact date on which the passage of an ordinance was no longer possible. Indeed, deciding when proposed legislation is "dead" is virtually impossible. A bill that is pronounced "dead" today may regain life tomorrow, or next week, or next year. Thus, Pulaski's approach for determining ripeness would bring uncertainty for everyone. Neither property owners nor the government would know for sure when a takings claim had matured.

For all of the foregoing reasons we hold that Pulaski's claim accrued upon the enactment of the Moratorium, for that was when the City interfered with Pulaski's use of its property in a clear, concrete fashion.*

_____

*The dissent concludes that Pulaski's takings claim accrued on May 5, 1994, when the Director of Public Works took action that was favorable to Pulaski by certifying to the City Council that a replacement incinerator was in the public interest. According to the dissent, the Director's power to certify provides an "administrative component" to the process for seeking an exemption from the Moratorium. See post at 15. Further, under the dissent's theory, the Director's certification on May 5, 1994, was a "final decision" under Williamson County Regional Planning Commission. It was not a final decision. Williamson makes clear that a takings claim is not ripe "until the administrative agency has arrived at a final, definitive position regarding how" it will allow "the particular land in question" to be used. Williamson, 473 U.S. at 191. See also id. at 186 (stating that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at

9

III.

Pulaski's second argument on appeal is that even if its takings claims accrued upon enactment of the Moratorium, the City's continued enforcement of the Moratorium and the City's conduct following the Moratorium's enactment constitute "continuing wrongs" that tolled the limitations period. Again, we disagree. The Moratorium squarely prohibited Pulaski from building a replacement incinerator on its property. Any taking thus occurred when the Moratorium passed. After that (as the following discussion demonstrates), nothing the City did changed the nature of the taking or enlarged its impact.

In National Advertising Company v. City of Raleigh, 947 F.2d 1158 (4th Cir. 1991), itself a takings case, we outlined the parameters of the "continuing wrongs" theory. We began by observing that "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." Id. at 1166 (quoting Ward v. Caulk, 650 F.2d 1144, 1147 (9th Cir. 1981)). We proceeded to apply a two-part analysis to determine whether a continuing wrong had occurred. We examined (1) "the nature of the wrongful conduct and harm alleged" and (2) "[t]he particular policies of the statute of limitations in question." National Advertising, 947 F.2d at 1167.

Pulaski's essential allegation of harm is that the Moratorium caused it to lose "the only economically beneficial or productive use of its property." In addition, Pulaski alleges that the following actions by the City were continuing wrongs: (1) threats to initiate condemnation proceedings against the property, (2) false expressions of support for a replacement incinerator that were designed to lure Pulaski into withdrawing its 1993 lawsuit for damages under the WDSA, (3) ces-

_____

issue.") (emphasis added). The Director did not have the authority to make a final decision on whether an exemption ordinance would be enacted. That decision was reserved for the City Council, and it was a decision that would be made through the legislative (or political) process. As the dissent recognizes, "it is difficult for a court to determine when a legislative process is `final.'" Post at 15. For that reason, we must conclude that any taking occurred (and Pulaski's claim arose) when the Moratorium was enacted.

10

sation of the use of Pulaski's facility for disposal of trash and refusal to allow Pulaski to dispose of ash at a City landfill, (4) bad faith refusal to consider the Exemption Bill, and (5) continuing efforts to defend the Moratorium in litigation initiated by Pulaski.

We will begin the analysis, as National Advertising requires, by looking at "the nature of the [continuing] wrongful conduct and harm alleged" by Pulaski. See National Advertising , 947 F.2d at 1167. For the harm to be continuing, it must add to the alleged takings injury or otherwise constitute a taking itself. See id. Pulaski's first allegation of continuing harm is that the City threatened to start condemnation proceedings after the Moratorium had been enacted. Pulaski acknowledges that the Moratorium caused it to lose the "only economically beneficial or productive use of its property." This means that any taking occurred at the time of the Moratorium's enactment. With the property already taken, a later threat of condemnation was not either a taking or the source of additional takings injury. Pulaski's second and third allegations of continuing harm relate to claims that the City interfered with or breached the WDSA, the agreement under which Pulaski incinerated trash for the City. These allegations are contract-related claims, not takings claims. Indeed, Pulaski waived all outstanding contractual claims against the City under the WDSA on May 3, 1995, nearly three years after the Moratorium was passed and one year after the Exemption Bill had been introduced. The fourth allegation, that the City Council refused in bad faith to consider the Exemption Bill, is also not an allegation of a taking or a takings injury. As we have indicated, the City Council's failure to act on the Exemption Bill was simply the exercise of political judgment. It was not a concrete governmental act that amounted to a taking of property. Pulaski's final allegation of continuing harm is the City's defense of the Moratorium when Pulaski sued to have it invalidated in state court. The City's defense of the Moratorium is simply one of the consequences of the Moratorium's enactment; the defense was "not a separate violation," and it did not add to any takings injury alleged. See National Advertising, 947 F.2d at 1167.

Finally, an examination of the "particular policies of the statute of limitations in question," National Advertising, 947 F.2d at 1168, supports the conclusion that the continuing wrong exception should not be applied here. In particular, the continuing wrong theory should not

11

be applied to relieve a plaintiff from its duty of reasonable diligence in pursuing its claims. See id. at 1168 (citing Ocean Acres Ltd. v. Dare County Bd. of Health, 707 F.2d 103, 107 (4th Cir. 1983)). Pulaski was aware of the Moratorium from the time of its enactment. It realized at the time that the Moratorium deprived it of significant beneficial and productive use of its property. Pulaski was in a position to challenge the Moratorium within the three-year statute of limitations, and it should have. There is nothing in statutes-of-limitations policies that require a finding of continuing violation.

IV.

Pulaski's last argument is that the City is equitably estopped from raising the statute of limitations as a defense to Pulaski's claims. Pulaski's estoppel argument is based on its assertion that the City reneged on its promise to exempt Pulaski from the Moratorium. The district court concluded that this argument was "far too weak to support [an estoppel] bar," noting that Pulaski's "reliance on the shifting sands of political support to overcome popular opposition to its plans hardly justifies it now in raising failure or withdrawal of that support as an estoppel." We also conclude that estoppel is not a bar, and we affirm on the reasoning of the district court. See The New Pulaski Company Limited Partnership v. Mayor and City Council of Baltimore, Civ. No. S 97-38, mem. op. at 5-6 (D. Md. July 22, 1997).

V.

Because the 1992 Moratorium interfered with Pulaski's primary use of its property in concrete ways (it could not build a replacement incinerator), the district court was correct to conclude that Pulaski's cause of action arose when the Moratorium was enacted. The district court was also correct to reject Pulaski's continuing wrong and estoppel theories. Because Pulaski's claims were time barred, we affirm the district court's order dismissing Pulaski's complaint. In light of this disposition, it will not be necessary for us to consider the City's cross-appeal.

AFFIRMED

12

WILLIAMS, Circuit Judge, dissenting:

Despite the fact that Pulaski pursued an exemption to a local zoning ordinance prior to bringing its takings claim in federal court, as required by Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985), the majority holds that Pulaski's claim is time-barred because its cause of action accrued upon the enactment of the ordinance and Pulaski failed to bring suit within the applicable statute of limitations. Because I believe that the applicable statute of limitations could not begin running until Pulaski at least received notice from the relevant administrative agency regarding its exemption request, I respectfully dissent.

In Williamson County, the Supreme Court noted that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the governmental entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Id. at 186. The reason for this requirement is simple: If an aggrieved landowner seeks administrative relief, "`a mutually acceptable solution might well be reached . . . obviating any need to address the constitutional questions.'" Id. at 187 (quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 297 (1981)). A takings challenge to the application of a governmental regulation to a specific piece of property is unripe if the regulation provides variance or administrative review procedures through which the aggrieved landowner might obtain relief and the landowner has not yet availed itself of those procedures. See National Advertising Co. v. City of Raleigh, 947 F.2d 1158, 1166 (4th Cir. 1991). In sum, the ripeness requirement properly forces courts to defer to a local governmental body's grievance procedure before passing judgment. It naturally follows that if an action is not ripe, the applicable statute of limitations cannot begin running. See Levald, Inc. v. City of Palm Desert , 998 F.2d 680, 687 (9th Cir. 1993); Biddison v. City of Chicago, 921 F.2d 724, 728-29 (7th Cir. 1991). In fact, the majority concedes as much. See ante at 7.

The City expressly indicated its willingness to suspend the general moratorium on improving or constructing incinerators if the Director

13

of Public Works submitted a written report detailing and analyzing the public interest in specific instances. See Baltimore, Md., Ordinance No. 128, 1992 Legislative Session (effective Sept. 6, 1992) (the Ordinance). In good faith, Pulaski followed the procedure outlined in the Ordinance, and, on May 5, 1994, obtained the Director of Public Works's certification that a new Pulaski incinerator was necessary to serve the public interest in the efficient and environmentally sound disposal of solid waste. At that point, the process moved to the Baltimore City Council, as contemplated by the Ordinance. Although a bill that would have exempted Pulaski from the Ordinance (the Exemption Bill) was introduced on or about May 9, 1994, it was never reported out of committee or brought for a vote. In fact, the City, in an answer to Pulaski's declaratory judgment action filed in federal district court on September 14, 1995, admitted that the Exemption Bill was "dead" as a legislative proposition.

Despite Pulaski's efforts to obtain an exemption from the Ordinance, the majority holds that Pulaski should have brought its claim at the time the Ordinance was enacted because the exemption procedure was "legislative" in nature, and, therefore, Pulaski never received a "final decision" on its exemption request. In support of this administrative/legislative distinction, the majority cites Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency , 911 F.2d 1331, 1345 (9th Cir. 1990) (Kozinski, J., dissenting in part) (Tahoe I), relied upon in Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency, 938 F.2d 153, 157 (9th Cir. 1991) (Tahoe II). Tahoe I involved the process by which a regional planning agency could adopt amendments requested by a landowner to a regional development plan. See Tahoe I, 911 F.2d at 1336. In concluding that the landowner did not need to ask for an amendment prior to bringing a takings claim, Judge Kozinski reasoned that because deciding whether to amend a law "requires an exercise of political judgment," id. at 1345, it is impossible "for a court to say that a legislative process has come to rest with respect to a challenged law," id. at 1345-46. The majority's reliance upon Tahoe I is not entirely apropos because the exemption procedure in this case involves both an administrative and legislative component. Pulaski was required first to undergo a finite administrative review by the Director of Public Works, and only after the Director of Public Works certified that Pulaski's proposed inciner-

14

ator was necessary to serve the public interest did the City Council have the authority to approve such construction by ordinance.

That the exemption process includes an administrative component is not an insignificant detail. If Pulaski had attempted to bring suit prior to seeking an exemption, there is no doubt that a federal court would have considered the action not yet ripe for a judicial determination. Pulaski correctly would have been sent back to the Director of Public Works to seek approval for an exemption because it had the right and obligation to seek a specific determination of how the Ordinance would affect its property before raising the constitutional takings question. See Williamson County, 473 U.S. at 186. It is simply disingenuous to hold, as the majority effectively does, that Pulaski knew "or ha[d] reason to know of the injury," National Advertising Co., 947 F.2d at 1162 (internal quotation marks omitted), when it did not even know whether the City would or could grant an exemption in accordance with the Ordinance. Indeed, had the Director of Public Works determined that Pulaski's proposed incinerator was not necessary to serve the public interest, I have no doubt that the majority would conclude that that determination was a "final decision" for purposes of satisfying the ripeness requirement of Williamson County. It simply makes no sense to conclude that Pulaski's claim accrued at an earlier time merely because it succeeded in convincing the Director of Public Works that it deserved an exemption from the Ordinance. Recognizing that it is difficult for a court to determine when a legislative process is "final," particularly where the legislature has broad discretion on whether to act, I would hold that Pulaski's claim ripened, and would start the running of the statute of limitations, when the Director of Public Works made its final determination on Pulaski's exemption request.

In sum, I believe that Pulaski's cause of action accrued on May 5, 1994, when the Director of Public Works completed his analysis and "certified to the City Council that a replacement incinerator at the Pulaski site was necessary to serve the public interest." Ante at 5 (internal quotation marks omitted). Because Pulaski filed its suit on December 31, 1996, well within the three-year statutory limit, I would

15

hold that its claim was not time-barred and would reverse the district court's dismissal of Pulaski's claim on this ground.*

_____

*I agree with the district court that the release executed between the parties does not bar this litigation and that Pulaski stated a claim for purposes of Federal Rule of Civil Procedure 12. Moreover, I am not persuaded by the City's arguments that this case is not ripe (1) because the moratorium was judicially invalidated before Pulaski received a final decision and (2) because it is possible that the City might approve an alternative proposal put forward by Pulaski. The latter argument is mooted by the invalidation of the statute. The first argument does not prevent Pulaski's claim from ripening because the claim asserts that the enactment and enforcement of the moratorium during the several-year time period deprived Pulaski of valuable property that is now unrecoverable.

16