**NAEGELE OUTDOOR ADVERTISING, INC., d/b/a Naegele Outdoor Advertising Company of Raleigh–Durham, Plaintiff,**

v.

**CITY OF DURHAM, Defendant.**

No. C–85–722–D.

United States District Court, M.D. North Carolina, Durham Division.

Aug. 24, 1992.

James L. Gale, Richard W. Ellis, Smith Helms Mullis & Moore, Raleigh, William Sam Byassee, Smith Helms Mullis & Moore, Greensboro, for plaintiff.

Karen A. Sindelar, and Reginald B. Gillespie, Jr., Brenda Maria Foreman, O. William Faison, Faison, Fletcher, Barber & Gillespie, Durham, for defendant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

This case is again before the court to undertake the "difficult" [1] task of determining whether the Defendant City of Durham's ("City") 1984 ordinance prohibiting all commercial, off-premises advertising signs except those along interstate or federally aided primary highways after a 5½–year grace period violates the Fifth Amendment's proscription, applicable to the states through the Fourteenth Amendment, against taking property without just compensation. In its initial decision in this case, the district court granted summary judgment in favor of the City on Plaintiff Naegele Outdoor Advertising, Inc.'s ("Naegele") First and Fifth Amendment claims. On appeal by Naegele, the United States Court of Appeals for the Fourth Circuit affirmed the district court's grant of summary judgment in favor of the City on the Plaintiff's claim that the ordinance abridged its First Amendment right of free

---

1. *Naegele Outdoor Advertising, Inc. v. City of* *Durham,* 844 F.2d 172, 178 (4th Cir.1988).

speech, but remanded the Fifth Amendment takings claim for consideration in light of recent decisions by the Supreme Court which set out the necessity for *ad hoc* factual inquiries in takings cases. *Naegele*, 844 F.2d at 177.

## I. PROPRIETY OF SUMMARY JUDGMENT

■ In its appeal to the Fourth Circuit, Plaintiff argued that it rented its billboards on a percentage exposure to the local advertising market, or "showing," basis. Naegele contended that the elimination of the billboards prohibited by the ordinance would adversely affect its integrated business and that it was entitled to compensation not only for the market value of the affected billboards but for the additional loss to the integrated business.

The court of appeals, citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), said that the question of taking depended on whether the ordinance denied Naegele the economically viable use of its property. The court of appeals indicated that on remand the district court should determine the appropriate unit of Naegele's property affected by the ordinance as part of its analysis of Naegele's taking claim. The court said that "[t]he appropriate unit is that one which is substantially affected by the ordinance. Its identification depends largely on the scope of Naegele's sharing contracts." *Naegele*, 844 F.2d at 178. The court also said that "[c]learly the unit is not composed of the affected billboards, which, like the coal pillars in *Keystone*, do not constitute a separate segment of property for taking purposes." *Id.* at 176.

After it determined the unit of property, the district court was directed to

> make findings pertaining to every aspect of Naegele's business that will be affected by the ordinance, including the number of billboards that can be economically used for noncommercial advertising, the number that are economically useless, the terms of Naegele's leases for billboard locations, the land Naegele owns for locations and whether it has any other economic use, the cost of billboards that cannot be used, the depreciation taken on these billboards and their actual life expectancy, the income expected during the grace period, the salvage value of billboards that cannot be used, the loss of sharing revenue, the percentage of affected signs compared to the remaining signs in Naegele's business unit, the relative value of affected and remaining signs, whether the amortization period is reasonable, and any other evidence presented by the parties that the court deems relevant.

*Id.* at 178.

It is this task that the court of appeals indicated would be difficult, and the court agrees. Following remand, this court has held three non-evidentiary hearings on the Fifth Amendment issues. After extensive discussions among counsel for the parties and the court, and as a result of suggestions by counsel and by the court, the parties undertook lengthy and exhaustive discovery. As a result of the exchange of information and ideas and negotiations between counsel, the parties have filed extensive factual stipulations that address the issues of fact identified by the court of appeals. These stipulations have resolved any areas of dispute and have enabled the court to focus its attention on the legal aspects of the case.

The court approaches the resolution of any issue in this case by way of summary judgment with great caution, particularly in view of the court of appeals' emphasis on the importance of an evidentiary hearing. However, this circuit recently has held that "while *ad hoc* factual inquiries are central to a takings analysis, summary judgment still may be appropriate, even if only infrequently, should a particular record reveal that the relevant facts are fully developed and that there is no dispute concerning them." *Georgia Outdoor Advertising, Inc. v. City of Waynesville*, 900 F.2d 783, 786 (4th Cir.1990) ("*Waynesville II*").

Although the court of appeals said that the impact of the ordinance on Naegele's

business required a full evidentiary hearing, it is doubtful that the court had in mind a situation in which the discovery and stipulations were so thorough and complete that there would be literally no genuine issue as to any material fact and the court could rule as a matter of law based on the undisputed facts. Therefore, the court does not believe that the court of appeals decision, in itself, would preclude the resolution of the issues in this case at the summary judgment stage.

The purpose of summary judgment is to allow resolution of cases without the time and expense of a formal trial if the constraints of Rule 56, Federal Rules of Civil Procedure, are met. A careful review of the stipulated facts and exhibits has persuaded the court that no genuine issue of material fact remains which would prevent the court from determining the appropriate unit of Naegele's property affected by the ordinance. Once the court has identified the appropriate unit affected, it must then determine whether the ordinance denies Naegele economically viable use of that unit by considering the factors identified in *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978): (1) the "economic impact of the regulation on the claimant," (2) the "extent to which the regulation has interfered with distinct investment-backed expectations," and (3) the "character of the governmental action". *See Naegele,* 844 F.2d at 176. Again, the court believes that the material facts as stipulated enable it to make the findings relevant to the application of the *Penn Central* factors.

## II. MATURITY OF THE TAKING CLAIM

■ As a preliminary matter, the court must consider whether Naegele's claim is premature. *Naegele,* 844 F.2d at 174–75 (citing *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 [1985], in which the Supreme Court held that a claim by a land developer that a county unconstitutionally took its property through the enactment of a zoning ordinance was premature because the develop-

er had neither sought a variance nor utilized state procedures for obtaining just compensation). In a case decided after *Naegele,* the Fourth Circuit held that a plaintiff outdoor advertising company suffered actual, concrete injury to the primary use of its property upon the enactment of an ordinance requiring removal of certain non-conforming outdoor advertising signs at the expiration of a 5½-year amortization period. *National Advertising Co. v. City of Raleigh,* 947 F.2d 1158 (4th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1997, 118 L.Ed.2d 593 (1992). The court held that on the date the ordinance was enacted there was both substantial interference with the property's primary use which affected distinct investment-backed expectations and concrete injury accompanying that interference. *Id.* at 1164. The court specifically rejected *Williamson County* as inapposite because the Raleigh ordinance did not contain any variance or compensation procedures through which a sign owner might obtain relief other than the amortization period. *Id.* at 1166. Like the ordinance at issue in *National Advertising,* the Durham ordinance contains no variance or compensation procedures and Naegele's claim is ripe for review. *See Lucas v. South Carolina Coastal Council,* — U.S. ——, ——, 112 S.Ct. 2886, 2891–92, 120 L.Ed.2d 798 (1992).

■ Even if Naegele were required to apply for just compensation in order to make its claim mature, such an application would very likely be denied. North Carolina General Statute § 40A–51 permits an action in inverse condemnation to recover just compensation for an alleged taking. If Naegele had filed such an action, there is little likelihood that it would have prevailed in light of North Carolina court decisions finding no compensation due when a challenged ordinance contained an amortization period. *See State v. Joyner,* 286 N.C. 366, 211 S.E.2d 320, *appeal dismissed,* 422 U.S. 1002, 95 S.Ct. 2618, 45 L.Ed.2d 666 (1975); *Summey Outdoor Advertising, Inc. v. County of Henderson,* 96 N.C.App. 533, 386 S.E.2d 439 (1989), *review denied,* 326 N.C. 486, 392 S.E.2d 101 (1990); *R.O. Giv-*

*ens, Inc. v. Town of Nags Head,* 58 N.C.App. 697, 294 S.E.2d 388, *cert. denied,* 307 N.C. 127, 297 S.E.2d 400 (1982). If Naegele had utilized the North Carolina procedure, it would be in virtually the same position it is now: the City would refuse to pay Naegele. Given this court's jurisdiction to hear the Fifth Amendment claim, it would be futile and a waste of judicial resources to require Naegele to apply for and be denied just compensation before continuing this action. *Cf. Georgia Outdoor Advertising, Inc. v. City of Waynesville,* 833 F.2d 43, 47 (4th Cir.1987) (*"Waynesville I"*). Thus Naegele's claim is ripe for resolution by this court.

## III. THE UNIT OF PROPERTY

■ The court's next task is to determine the unit of Naegele's property affected by the ordinance. The parties have stipulated to the facts necessary for the court to resolve this question, and both have moved for summary judgment. As a result of the stipulations, the undisputed facts include the following. The land on which each sign is located is not owned by Naegele, but is leased from the landowner under a written contract. Joint Stipulation of Undisputed Facts, Ex. A, ¶ 13 (Dec. 11, 1991) [hereinafter "Stip. A"].[2] Each lease allowing construction of a sign is negotiated separately. *Id.* Each sign, which may contain more than one sign face, is recognized as an individual structure by the City and is subject to separate inspection and permitting procedures. *Id.* at ¶ 26. Each sign is taxed separately. *Id.* at ¶ 35.

Naegele's commercial advertising is marketed and purchased on a "showing" or "share" basis. For example, a customer desiring a "fifty showing" in the Durham metro market would purchase billboard space sufficient to convey its message to fifty per cent (50%) of the driving audience

in a given time period. Naegele's standard rates in the Durham metro market are based on twenty-five, fifty, seventy-five and one hundred showings. *Id.* at ¶ 28. Only 1.7% of Naegele's advertising between September 1, 1986, and December 31, 1989, was sold on an individual sign basis. *Id.* Thus, the undisputed facts indicate that over a three-year period 98.3% of Naegele's billboard advertising customers purchased a showing of at least the Durham metro market rather than individual signs. Moreover, 65.86% (7,064 of 10,726) of the sign faces Naegele sold between 1985 and 1989 were for Durham-only showings. Joint Stipulation of Undisputed Facts, Ex. B, ¶ 46 (Dec. 11, 1991) [hereinafter "Stip. B"].

■ As the Supreme Court said in *Penn Central,* " 'taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." 438 U.S. at 130, 98 S.Ct. at 2662. The proper focus is on the character of the action and the nature and extent of the interference with rights in the parcel as a whole. *Id.* at 130–31, 98 S.Ct. at 2662. This case differs from many takings cases in that the Durham ordinance affects multiple properties owned by one entity. Naegele argues that the unit of property affected by the ordinance is its leasehold interest in each individual sign. On the other hand, the City contends that the unit of property is relevant only if this court determines that the 5½–year amortization period is inadequate.[3]

In the alternative, the City argues that because Naegele accounts for the revenues earned in the Durham area advertising market only as a component of the much larger Raleigh/Durham operating division and not as a separate division, Stip. A at

**2.** The parties have stipulated to facts that are undisputed for any purpose in Exhibit A, and facts that are undisputed only for purposes of summary judgment in Exhibit B, to the Joint Submission.

**3.** While it is true that the amortization period is not irrelevant to the takings analysis, *Naegele,* 844 F.2d at 177, the court must first establish

the unit of property as a basis for determining, via the three-factor *Penn Central* test, whether a taking has occurred. *See, e.g., National Advertising,* 947 F.2d at 1164 n. 6; *Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 169–70 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992); *Waynesville II,* 900 F.2d at 787.

¶ 31, the Raleigh division is the appropriate unit of property. This division covers most of eastern North Carolina. *Id.* at ¶ 30. According to the City, the smallest possible unit of property is the Durham metro market because Naegele sells the signs in this market as a unit.

The court agrees with the City's last contention, particularly given the stipulation showing that virtually all of Naegele's advertising sales are of combinations of signs in the Durham metro market, and not sales of individual signs. "Clearly the unit is not composed of the affected billboards, which, like the coal pillars in *Keystone,* do not constitute a separate segment of property for taking purposes." *Naegele,* 844 F.2d at 176. If Naegele owned only one sign, and the use of that sign were prohibited by the Durham ordinance, the court would, of course, look to that one sign as the unit of property. But since the reality of Naegele's business is that Naegele combines the leasehold interests in its signs into a unit in selling outdoor advertising in the Durham area, it follows that the unit of property to be considered for takings purposes is the combined group of Durham metro area signs.[4] This finding comports with existing takings law. *See Penn Central,* 438 U.S. at 130–31, 98 S.Ct. at 2662; *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) ("[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety.") Accordingly, Naegele's motion for summary judgment will be denied, and the City's motion for summary judgment on the unit of property issue will be granted.

### IV. RELEVANT ASPECTS OF NAEGELE'S BUSINESS

■ Having determined the maturity of Naegele's claim and the appropriate unit of

**4.** In reaching this conclusion about the unit of Naegele's property affected by the ordinance, the court has not aggregated Naegele's unrelated property interests in a particular vicinity, *see Lucas,* — U.S. at — n. 7, 112 S.Ct. at 2894 n. 7 (state court's aggregation of total value of all real property in vicinity owned by plaintiff in

its property, the court next must determine whether the interference with Naegele's property resulting from the enactment of the ordinance was of such a magnitude to constitute a taking. *National Advertising,* 947 F.2d at 1164. Whether the ordinance denies Naegele the economically viable use of its property is a factual inquiry. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. As previously noted, three broad factors are particularly significant to this inquiry: (1) the economic impact of the ordinance on Naegele; (2) the extent to which the ordinance interferes with Naegele's investment-backed expectations; and (3) the character of the governmental action. *Id.; see Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979).

In its most recent decision on a takings claim, *Lucas v. South Carolina Coastal Council,* the Supreme Court added a fourth area of inquiry to the takings analysis. If an evaluation of the three *Penn Central* factors indicates that the challenged regulation deprives property of "all economically beneficial use, ... [the government] may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Lucas,* — U.S. at —, 112 S.Ct. at 2899. Before conducting the *Penn Central* analysis and determining whether to apply the *Lucas* test, the court will evaluate the record in light of the stipulated facts and consider the evidence relevant to the takings inquiry identified by the court of appeals in *Naegele,* 844 F.2d at 178.

### Number of Billboards Usable for Non–Commercial Advertising

Generally, non-commercial advertisers will not advertise unless the advertising is

*Penn Central* was "extreme" and "unsupportable" approach to takings calculus). Rather, the court has considered the particular facts of this case and the nature of the outdoor advertising business in concluding that the relevant unit of Naegele's property is its business in the Durham metro area.

free or very low cost. Stip. B at ¶ 55. The total revenue for non-commercial advertising was $148,587.10 between 1984 and 1989: $13,422.00 in 1984; $14,172.50 in 1985; $44,015.00 in 1986; $21,440.10 in 1987; $30,676.80 in 1988; and $24,860.70 in 1989. *Id.* at ¶ 47. Despite this revenue, the parties agree that no economically viable market exists for non-commercial advertising on the structures that otherwise must be removed to comply with the ordinance. *Id.* at ¶ 54.

### Number of Billboards that are Economically Useless

All 105 or 106 sign faces (64 to 70 sign structures) affected by the ordinance are economically useless because they cannot be used for commercial or non-commercial advertising and they have no salvage value. *Id.* at ¶¶ 50–53.

### Terms of Naegele's Leases for Billboard Locations

The parties have stipulated to the leasing history of each of the disputed signs. Stip. A at ¶ 15. The average maximum lease term, including extensions, for the disputed signs was 8.6 years per face as of September 4, 1984. *Id.* at ¶ 16a. The average time remaining on the leases, without options to extend, for the disputed sign faces was 5.9 years as of September 4, 1984. *Id.* at ¶ 16b. The average annual lease payment per face as of September 4, 1984, was $200.00. *Id.* at ¶ 16c. The leases allow Naegele to reduce its rent, pay no rent, or cancel the lease if a government regulation restricts the use of the sign. *Id.* at ¶ 17. The lessor may terminate the lease if he or she decides to develop the land. *Id.* at ¶¶ 19–20. Naegele owns the signs as personal property and must remove them when the leases expire. *Id.* at ¶ 18.

### Land Naegele Owns for Locations and Whether it has Any Other Economic Use

Naegele does not own any land on which billboards are located. All sites are leased. *Id.* at ¶ 13. Although the property owner may use the property surrounding a sign for purposes other than advertising, Naegele's only use of the leasehold is for advertising. *Id.* at ¶ 14.

### Cost of Unusable Billboards

The court is uncertain what the court of appeals meant by "cost." Examples of cost include original construction cost, removal cost, and replacement cost. The total tax value of the disputed signs as of 1990 was $126,420.00. *Id.* at ¶ 35. Because construction cost data exists for only some of the signs, the best available method of approximating the original cost of the signs is to use the greater of the 1984 tax value or the original construction cost. Using this method, the total original cost of the disputed signs is $130,435.00. *Id.* at ¶ 39. The total removal cost for the disputed signs is $84,677.31. Stip. B at ¶ 49. The average removal cost per face is $781.65. *Id.* at ¶ 49a. The replacement cost of the disputed signs is $428,136.00. Stip. A at ¶ 36. There is no "carrying cost" of the unusable signs because the leases allow Naegele to terminate a lease upon an adverse regulatory action. *Id.* at ¶ 17.

### Depreciation Taken on Usable Billboards and Their Actual Life Expectancy

Major Media of the Southeast, Naegele's predecessor, depreciated the signs over fifteen years for accounting purposes. *Id.* at ¶ 27. Naegele depreciates its signs over twenty years for accounting purposes, and over five years for tax purposes. *Id.* The life expectancy of the signs exceeds the period Naegele uses or has used for accounting purposes. *Id.* As of September 4, 1984, the life expectancy of a wooden sign was more than twenty years, and of a steel sign more than forty years. Stip. B at ¶ 48. There are eighty-two steel and twenty-one wooden disputed signs now standing. Stip. A at ¶ 10. The average age of the disputed faces is 15.2 years as of September 4, 1990, and 9.2 years as of September 4, 1984.[5] *Id.* at ¶¶ 10, 16d.

---

5. These figures were derived from the sign ages provided in Attachment 2 to Stip. A, ¶ 10. The

### Income Expected During
### the Grace Period

The parties stipulated to revenue earned from January 1, 1984, to December 31, 1989. *Id.* at ¶ 23. Total revenue from the disputed signs during that period was $1,707.759.18. *Id.* Total revenue in the Durham zoning jurisdiction was $4,882,-367.21. *Id.* The total in the Durham metro area was $5,741,222.78. *Id.*

### Salvage Value of Unusable Billboards

The cost to remove the billboards is greater than the average salvage value of the sign parts that would be removed. Stip. B at ¶ 50. Naegele has more spare parts than it can use in the foreseeable future in Durham or any of its other divisions. *Id.* at ¶¶ 51–52. Even if salvaged parts could be used in other divisions, such use is impracticable due to the high cost of shipment and probability of damage in transit. *Id.* at ¶ 53. Therefore, the unusable billboards have no salvage value.

### Loss of Sharing Revenue

The parties contend that the value of the remaining signs is decreased because Naegele's market coverage of the Durham area is reduced as a result of the ordinance. *Id.* at ¶ 56. Yet the parties have not offered any stipulations or evidence as to the dollar amount of the decrease in value of the remaining signs. Furthermore, the parties have stipulated that as of 1984 the fair market value ("FMV") of Naegele's signs in the Durham metro area, or any group of signs within it, was four times their annual revenue. Stip. A at ¶ 3. As of 1990, the FMV "of the signs within the Durham metro market, or of any group within that market" was 3.5 times their annual revenue. Stip. B at ¶ 45. Because these stipulations assign the same multiplier regardless of the number of signs under consideration or whether they are covered by the ordinance, any argument that the ordinance adversely affects Naegele's integrat-

ed business rather than the individual signs alone seems to be foreclosed. Nevertheless, the parties agree that because the demand for advertising on a showing basis is much higher than that for individual signs, the reduction in sign coverage caused by the ordinance reduces the amount of showing advertising available. *Id.* at ¶¶ 56–57.

Between January 1, 1985, and December 31, 1989, Naegele sold 3,662 faces located in Durham as part of advertising contracts that included signs from outside the Durham metro area. *Id.* at ¶ 46. Revenue from the Durham faces in those larger contracts totaled $862,465.33 in that period. *Id.* During the same time period, Naegele sold a total of 7,064 faces as part of a Durham only showing; revenue from these Durham signs totaled $1,551,687.44. *Id.* Hence, of the 10,726 Durham sign faces sold in that period, 34.14% were sold as part of showings that included signs outside the Durham metro area.

These figures are not entirely helpful because they do not reveal what portion of the revenue came from signs affected by the ordinance. If the disputed signs contribute 29.75% of the total revenue, Stip. A at ¶ 23, a projection of the sharing revenue that will be lost during a comparable period after the ordinance becomes effective is 29.75% of $862,465.33, or $256,583.44.

### Percentage of Affected Signs Compared
### to Remaining Signs in Naegele's
### Business Unit

Given that a taking is measured from the date the challenged ordinance is enacted, *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 320, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987); *National Advertising*, 947 F.2d at 1163, the benchmark for the number of signs affected is the face count as of 1984 rather than the number of faces that currently exist. In 1984, there were 123 signs affected by the ordinance, and a total of

court notes that these figures may be obtained only by dividing by sixty sign *structures,* not 102 sign *faces,* although Stip. A, ¶ 16d states the sign age in terms of faces. In addition, Attachment

2 lists 106, not 102, sign faces. The average age of the 106 sign faces is 8.75 years as of 1984, and 14.75 years as of 1990.

270 in the Durham metro area. Stip. A at ¶ 25. Currently, there are 105 disputed signs and a total of 231. *Id.* The percentage of affected signs compared to remaining signs was 83.6% in 1984 and 83.3% in 1990.[6] The ordinance reduces the total number of signs in the Durham metro market by 45.5% as of either date.

### Relative Value of Affected and Remaining Signs

Like cost, value is a nebulous concept. One way to measure value is by looking at revenue generated. Total revenue from the disputed signs from 1984 to 1989 was $1,707,759.18. Total revenue in the Durham zoning jurisdiction was $4,882,267.21. The total in the Durham metro area was $5,741,302.78. *Id.* at ¶ 23. Based on the contribution of the disputed signs to Naegele's Durham metro area revenue during the amortization period, Naegele will lose a projected 29.75% of its annual revenue in that area when the ordinance becomes effective.

The FMV of the signs in 1984 was four times their annual gross revenue. *Id.* at ¶ 3. Using this methodology, in 1984 the FMV of the disputed signs was $998,-849.04, and the FMV of the non-disputed faces was $2,159,853.92. *Id.* at ¶ 23. The total 1984 FMV of all Durham metro area signs was $3,158,702.96. *Id.* The value of the disputed signs represents 46.25% of the value of the non-disputed signs, and 31.62% of the value of all signs in the Durham metro area.

In comparison, the FMV of the signs as of 1990 was 3.5 times their estimated annual gross revenue. Stip. B at ¶ 45. Using this methodology, the 1990 FMV of the disputed faces in the Durham metro market was $965,525.00, and the FMV of the non-disputed faces was $2,568,925.00. *Id.* The 1990 FMV of all signs in the Durham metro area was $3,534,450.00. *Id.* The value of the disputed signs represents 37.-59% of the value of the undisputed signs and 27.32% of the total value of all signs.

### Reasonableness of the Amortization Period

■ The inclusion of an amortization period in a zoning ordinance allows the property owner, if he cannot make his use of the property conform to the ordinance, to recover all or part of the value of the property before the use is forbidden at the end of the period. *Waynesville II*, 900 F.2d at 785; *Newman Signs, Inc. v. Hjelle*, 268 N.W.2d 741, 754 (N.D.1978), *appeal dismissed*, 440 U.S. 901, 99 S.Ct. 1205, 59 L.Ed.2d 449 (1979); *Naegele Outdoor Advertising Co. v. Village of Minnetonka*, 281 Minn. 492, 162 N.W.2d 206, 213 (1968). Amortization periods have been used in lieu of eminent domain proceedings, which require the payment of compensation, *State v. National Advertising Co.*, 409 A.2d 1277 (Me.1979), and instead of forbidding a non-conforming use as of the date of enactment, which could effect a taking. *Modjeska Sign Studios, Inc. v. Berle*, 43 N.Y.2d 468, 402 N.Y.S.2d 359, 365, 373 N.E.2d 255, 260 (1977), *appeal dismissed*, 439 U.S. 809, 99 S.Ct. 66, 58 L.Ed.2d 101 (1978); *Grant v. Mayor of Baltimore*, 212 Md. 301, 129 A.2d 363 (1957).

■ The presence of an amortization period does not establish the validity of the ordinance as a matter of law, nor does the absence of such a provision render such an ordinance an unconstitutional taking. *Waynesville II*, 900 F.2d at 786; *Naegele*, 844 F.2d at 177. For an amortization period to be reasonable it must give the property owner a reasonable opportunity to recoup or minimize the loss of use of his property by the end of the amortization period. *Id.*

■ Factors relevant to the reasonableness of the amortization period include many of those discussed above, including the initial cost of, or investment in, the signs, the degree to which the signs have been fully depreciated, the remaining useful life, the replacement cost and salvage value of the signs, the alternative uses for

---

**6.** The Fourth Circuit specifically requested this comparison. The percentage was derived for 1984 by subtracting 123 from 270, then dividing 123 by the result of 147. For 1990, 105 was subtracted from 231, then 105 was divided by the result of 126.

the signs, the loss of revenue as a result of the ordinance, and the percentage of signs affected. *See also Tahoe Regional Planning Agency v. King*, 233 Cal.App.3d 1365, 285 Cal.Rptr. 335, 353 (1991); *City of Salinas v. Ryan Outdoor Advertising, Inc.*, 189 Cal.App.3d 416, 234 Cal.Rptr. 619, 623 (1987); *Inhabitants, Town of Boothbay v. National Advertising Co.*, 347 A.2d 419, 424–25 (Me.1975); *Modjeska Sign Studios*, 402 N.Y.S.2d at 367, 373 N.E.2d at 262; *Lubbock Poster Co. v. City of Lubbock*, 569 S.W.2d 935, 941–42 (Tex.Civ.App.1978), *writ ref'd n.r.e.* (Jan. 17, 1979), *cert. denied*, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). As noted above, Naegele received $1,707,559.18 from the disputed signs during the amortization period. Naegele has benefitted from income it earned from the disputed signs for two additional years while this litigation has been pending. The revenue Naegele earned from the disputed signs between 1984 and 1989 far outweighs the estimated original construction cost of $130,435.00, the removal cost of $84,677.31, and the replacement cost of $428,136.00. Naegele also has received nearly twice the 1984 FMV of the disputed signs during the amortization period. Because the leases contain a termination clause, Naegele will not suffer any loss because of continued liability on its leases.

■ Although a number of the signs are not fully depreciated and have useful lives remaining after the expiration of the amortization period, the reasonableness of an amortization period does not necessarily depend on the recovery of all value of the property during the allotted time. *See Waynesville, II*, 900 F.2d at 786; *Modjeska*, 402 N.Y.S.2d at 367, 373 N.E.2d at 262. Thus the failure of the amortization period to allow Naegele's recovery of the present value of the income stream it could expect from the signs over their remaining useful lives does not render it unreasonable.

## V. ECONOMIC IMPACT OF THE ORDINANCE

As a result of the findings made above on the relevant aspects of Naegele's business, the court can now address the inqui-ries identified in *Penn Central* to determine if the ordinance denies Naegele the economically viable use of its property. One of the difficulties in regulatory takings cases is deciding where to draw the line between government's right to regulate for the public good and the right of a private property owner to use his property without interference. *Cf. Lucas*, —— U.S. ——, 112 S.Ct. at 2895. Neither right is absolute. "[G]overnment regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.*" *Andrus v. Allard*, 444 U.S. at 65, 100 S.Ct. at 326; *accord Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659; *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). However, "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas*, —— U.S. ——, 112 S.Ct. at 2895.

■ The Durham ordinance must be evaluated in light of its impact on the entire set of Naegele's property interests. Naegele retains the use of 126 of 232, or 54%, of its signs in the Durham metro market. The ordinance destroys all economically beneficial use of the remaining 106 signs at the expiration of the amortization period. The loss of the affected signs will likely reduce Naegele's revenue by 29.-75% in the Durham metro market, but this fact alone is not dispositive of the takings question. *Penn Central*, 438 U.S. at 131, 98 S.Ct. at 2663.

■ Whether or not the revenue recovered during the amortization period might be "just compensation" if a "taking" had occurred, the benefit conferred by the grant of an amortization period may be taken into account in considering the economic impact of the regulation. *See Penn Central*, 438 U.S. at 137, 98 S.Ct. at 2666 (landowner's transferrable development

rights conferred by government program mitigate financial burden imposed even if not "just compensation"). By virtue of the amortization period granted in the ordinance, Naegele has earned more than $1.7 million in revenue and has had 5½ additional years of use of the disputed signs. Based on its earnings during the amortization period, Naegele will lose this revenue, which includes an estimated $256,583.44 in sharing revenue, during a comparable time period after the ordinance is enforced. Nonetheless, Naegele has not contended that its outdoor advertising business in the Durham metro market will no longer be viable after the ordinance requires removal of the affected signs. Naegele has recovered nearly twice the fair market value of the disputed signs during the amortization period, and there is no evidence that Naegele will not be able to realize a reasonable return on its remaining signs.

## VI. INTERFERENCE WITH INVESTMENT–BACKED EXPECTATIONS

■ When Morris Communications Corporation purchased the assets of Major Media of the Southeast (Naegele's predecessor) on July 18, 1985, the purchase price of $400 million was not adjusted to account for the diminished value of the Durham signs as a result of the ordinance. Stip. A at ¶¶ 1, 2, 9. There was no downward adjustment because Morris expected that Naegele would be paid the fair market value of any signs required to be removed. *Id.* at ¶ 9. This type of expectation differs from that motivating a substantial investment to improve property before the owner knows its use will be limited by government action, *see Kaiser Aetna,* 444 U.S. 164, 100 S.Ct. 383, but indicates that Morris contemplated having either the use of the signs or compensation for the inability to continue to use them.

■ It is doubtful that this expectation was logical in light of takings jurisprudence as of 1985 and the prior experience of outdoor advertisers in Fifth Amendment litigation.

A person who purchases land with notice of statutory impediments to the right to develop that land can justify few, if any, legitimate investment-backed expectations of development rights which rise to the level of constitutionally protected property rights ... the state cannot be the guarantor by inverse condemnation proceedings, of the investment risk which people choose to take in the face of statutory or regulatory impediments. *Claridge v. New Hampshire Wetlands Bd.,* 125 N.H. 745, 485 A.2d 287, 291 (1984); *see Finch v. City of Durham,* 325 N.C. 352, 384 S.E.2d 8 (1989). Further, a reasonable property owner must expect that the uses of his property may be restricted from time to time by the state in the legitimate exercise of its police power. *Lucas,* — U.S. —, 112 S.Ct. at 2894. This is especially true in the case of personal property such as signs and leases for sign locations. *Id.*

The useful lives of the signs are another factor in the investment-backed expectations analysis. As of September 4, 1984, the average age of the disputed signs was 9.2 years, and the life expectancies of the wooden and steel signs were twenty and forty years, respectively. Thus, the wooden signs had an average of almost eleven years of remaining useful life, and the steel signs had an average of nearly thirty-one years of remaining useful life. Although the disputed signs had significant remaining useful lives, there was an average of only 8.6 years remaining on the leases for the disputed signs, including all possible extensions, as of September 4, 1984. Thus, the amortization period allowed Naegele the continued use of the disputed signs for most, if not all, of their remaining lease terms. These facts were known, or could easily have been ascertained, at the time of Morris' purchase in 1985.

## VII. CHARACTER OF THE GOVERNMENT ACTION

■ "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion

by the government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659 (citation omitted); *accord Lucas*, —— U.S. ——, 112 S.Ct. at 2893; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982). The Durham ordinance is not a physical invasion of Naegele's property, and has been found to be a legitimate exercise of the police power regulation for aesthetic purposes. *Naegele*, 844 F.2d at 174.

## CONCLUSION

■ Without question, Naegele has suffered a significant loss in the economic value of its property, as much so as if the City had put a highway directly over the underpinnings of its billboards. Regulatory deprivations, however, have been held by the Supreme Court to be outside the scope of the takings clause unless they go "too far." It has also been held that the Constitution does not protect economic values from diminution by government regulation. Applying these standards, the court must conclude that the Durham ordinance does not go too far. Naegele has not suffered a physical invasion of its property in the usual sense, and it has not been deprived of all economically viable use of its property interests as a whole.[7] The court is not writing on a clean slate. In order to provide equal justice under law, inferior federal courts must apply today's law regardless of any perceived trend toward greater recognition of private property rights. The court therefore concludes that the Durham ordinance does not deny Naegele all economically viable use of its property and thus does not constitute a taking, and will grant the City's motion for summary judgment on Naegele's Fifth Amendment claim.

---

7. The court is not unmindful of the significance of its determination that each individual sign does not constitute a separate unit of property. If it did, the *Lucas* inquiry into the nature of Naegele's title could be determinative. *See Lucas*, —— U.S. at ——, 112 S.Ct. at 2894.